And we'll turn to the final case to be argued today, which is Hart v. Charter Communications. And for the appellant, we have Mr. Soderstrom. Is it pronounced Soderstrom? Soderstrom. Soderstrom. Mr. Soderstrom. And for the appellee, we've got Mr. Prins. Okay, so we'll proceed with Mr. Soderstrom. This case was set for 15 minutes per side. And so if you would, if the appellant would like to have a rebuttal argument, please try to stop within the time. However, as I said at the outset, you've all made sacrifices to help us remotely. So without further ado, I'm giving each of you an extra two minutes and let us know if you don't need that, you don't have to use it. Okay, let's go proceed with the appellant's argument. Thank you, Your Honor, and may it please the court. The company that seeks arbitration has an affirmative burden to approve two elements of state contract law. First, it must affirmatively prove that it gave clear and conspicuous notice of terms that include the arbitration clause. And second, it must affirmatively prove that it considers this. Mr. Soderstrom, Judge Gould interject, your voice is going in and out a little, so please try to make sure you're speaking into the microphone. Yes, Your Honor. The first requirement is clear and conspicuous notice that is communicated to the consumer, and that is an affirmative burden that must be approved by the party seeking to compel arbitration. And the second is the burden to prove that the consumer gave unambiguous consent to terms that contain the arbitration clause. Consent and a notice can't be obscured. It cannot be settled. It must be an obvious and transparent information. Secondary to that is if there is any genuine issue concerning the arbitration process, it must be before the Federal Arbitration Act. I'm sorry, Mr. Soderstrom. This is Judge Stein. I'm having difficulty hearing you. As Judge Gould said, you seem to be cutting in and out. I don't know if that's something our IT expert can change or something, what you're doing, but you're simply cutting in and out. I'm having difficulty following. I'd be happy to dial in and be myself. That would be easier. I'm not sure what. I hear you just fine. Well, now you're coming in. Perhaps it's because you're leaning forward. Do you want to try that? I'm happy to do that. That's it. Now I can hear you fine. I think you're just too far. Okay. Great. Thank you. That means you're going to have the burden of arguing without leaning back. I just don't want my face to be too close. For example, ruining my face. That's okay. It's not too close. Okay. I can't see myself. It feels close. So, to be clear, it is the company's burden to prove clear and conspicuous evidence and to prove unambiguous manifestation of consent. Where there is any factual dispute, those that in fact must be submitted to the jury under Section 4 of the FAA. All right. Let me stop you there. Put aside the question of whether it's the 2014 agreement that controls or the 2017 agreement or none, for that matter, as non-signatories. And let me ask a question coming from what you've just said. At page 111 of the record, you have in very heavily outlined box, the sentence, this agreement contains a binding arbitration clause which says that you and TWC agree to resolve certain disputes through arbitration. It also contains a limitation on your right to bring claims against TWC more than one year after the relevant events occurred. You have the right to opt out of this part of the agreement. See sections 14, 15, and 16. Are you arguing, I don't think you really can, but are you arguing that that's not reasonably conspicuous notice of an agreement to arbitrate? No, we're not arguing that that notice is not reasonably conspicuous. The question is a predecessor question. Was the agreement containing this notice at the beginning of the term? Was the existence of that agreement in itself clearly, conspicuously dictated to the customer? And did the customer, with notice, disagree with existence? Counsel, your voice is going out again. I'm sorry, Your Honor. Can we stop the clock? Does anybody have a cell phone? Yes, Judge, this is Richard. I would recommend at this point that Mr. Soderstrom try dialing in to the call because the video is not serving us very well, unfortunately. Yeah, and what we'll do is this, Mr. Soderstrom. The panel will have the video. We promise to remember your face. We can go to our website and play it again, but we'll let you make the argument by phone. And, Mr. Soderstrom, you have the ability, at least as far as I'm concerned, to say from now on that you were in the face of the Ninth Circuit. Okay. Thank you. I'm going to mute myself at home. Mr. Soderstrom, as soon as you're connected by phone, I will be cutting your video connection. Richard, did we confirm that nobody has a cell phone? I have a cell phone, Judge. Who does? This is Richard. I do have a cell phone. No, but I mean Mr. Soderstrom. We're working on this right now. He's about to call into the video call using his phone. Okay, thanks. Thank you, Judge. Richard, this is Judge Christin. When we patch in the cell phone, do you have to cut off the video or we'll be able to see counsel? I could leave the video up, Judge, if you would prefer that. I can do so, but if it's having an adverse effect on the quality of the audio, it's a good idea to cut it. Okay. My preference is that you give it a shot, and if it doesn't work, it doesn't work. But thanks so much. Yes, Judge, thank you. I also think we should consider having Mr. Soderstrom get rid of the cell phone. Then use the video. But I guess we've concluded it's the best way to do it. Richard, what number did I call you? I just said there was no meeting. The CMA instructions that were the most recent instructions I sent you this morning, sir. Is that the dial-by-location San Jose? Negative. Stand by. The most recent email to you was 940 this morning. It has the click to join, join.uc.uscourts, or there's a call-in number listed below that. 571? Yes. I'm keeping the cell phone in the room, cause the problem. Shh. I have a problem here. On a technical note, Mr. Prins, I do see you, and I do see we have active video from you. Can you just say a couple words, make sure we still have your audio? Can you hear me now? Yes, thank you very much. Thank you. I believe I'm on. Richard, can you hear me? Yes, we can hear you now. I have muted your audio from your computer to try to prevent the feedback. Judge, I think we're all set to go. Mr. Soderstrom, sorry. Pardon me, Judge. Mr. Soderstrom, please turn your volume down on your speakers on your computer, cause that's feeding back into your cell phone. I just did that. Thank you. All set to go, Judge. Okay. Okay, we'll let Mr. Soderstrom continue. If you want to backtrack for 30 seconds to pick up about where you left off. The good news is... The answer, Judge Stein... I'm sorry. I was just going to say the good news is you will never have a more nerve-wracking argument before the ninth circuit. The rest of your life, it's all downhill. The panel's being very accommodating, so I appreciate that. Judge Stein, to answer your question, the notice within the online contract terms themselves, that notice is certainly clear and conspicuous. If a consumer ever learned that those terms existed, the notice within the terms is clear and conspicuous. We are not arguing that that box on the first page of the contract itself is not clear and conspicuous. What Judge Carter analyzed, and where I believe he erred, is the predecessor question, which is whether any of Ms. Hart's bills or other interactions with the company gave her clear and conspicuous notice that this contract even existed posted on the company's website. Let's take a look at that. Page 139 of the record and others has the March 2014 bill where it says, and it's not shaded, and I grant you it's not in a box, but it does say you have a new TWC subscriber agreement which contains an arbitration clause, a clause that may limit the time you have to bring a claim against us. Other important terms, review it if you wish, opt out of some of the clauses at, and it gives a website. Isn't that a reasonably conspicuous notice? I don't believe so, Your Honor, for two reasons. First, as many online contract formation cases have shown in recent years, the notice needs to be precisely coupled to the act that the company is saying is going to form an agreement, but a related question that Starks v. Square Trade, a court in the Second Circuit focused on and other courts have focused on, is the history of interactions between the customer and the company. In this case, according to Ms. Hart's testimony and according to the record or the absence of evidence that Charter chose to place into the record, this would have been the 40-something bill that Ms. Hart received and paid. There is no evidence that any bills over the preceding three-and-a-half years ever contained this type of notice, ever attached a copy or even a separate bill stuffer notice indicating there were terms online, or gave her any indication that she should look under the Enjoy Time Warner Cable Better banner, which is typically used for advertisements, to inspect that place in the bill to see if some of her contract rights may be changed or whether her relationship with the company may be fundamentally altered. It's specific to here, altered in a way that waives very important rights, procedural rights, substantive rights, the right to access to the court. These are important rights that she needs to waive, if she will waive them, knowingly and intelligently. And here you have a multi-year course of dealings between a customer and a company. And what has happened is the company intermittently without any other notice includes in small font under three other advertisements that do not relate to her specific relationship with the company. The company says this one paragraph in bill number 42 completely altered your rights and obligations with the company. And that is where Judge Carter erred here. Judge Carter did not take into consideration the context of the consumer relationship, did not take into consideration if this notice is clear and conspicuous and within the greater picture of what were the preceding 42 bills. What did they say? If the preceding 42 bills said please pay for the pay-per-view advertisements in that exact spot, and then all of a sudden bill number 43 says we're changing your contract rights, look online if you want to know about it. That is a fundamental difference and it creates at a minimum a genuine issue of material fact as to whether this notice in this bill was both clear and conspicuous and equally important whether the payment of this bill in particular could unambiguously provide assent to those terms. Given that there was this long, you can take it as a hypothetical if you want, a long-standing consumer relationship, what should they have done to provide adequate notice? There are numerous ways companies can provide adequate notice and many companies do it all the time. They include with a bill a notice that says attached to this bill is a copy of your terms. If you pay this bill, you will be agreeing to these terms. These new terms? We're changing the deal. We're changing the terms. Is that it? We're changing the terms because we've got this long? Yes. Exactly. The company has an affirmative obligation. It is the master of its own online terms. It has complete control over how it gives notice of them and how it requests assent. Here, it chose to only give intermittent notice using a bill that was in a long line of bills that didn't include a notice and it did not require Ms. Hart or any other consumer to take an action that affirmatively showed she saw the notice and knew she was agreeing to new terms posted on the website. Can you give me the ER site again? Counsel, could you give me the ER site again? I'm looking for the notice that Judge Stein was just referring to. I have a question about it. ER 139. 139. Okay. Go ahead. I'll find it. Go ahead. So the question is, if every Enjoy Now, Enjoy TWC Better placed in her bill for three and a half years did not include any type of notice that indicates there are online terms she should review and she must accept if she wants to be a customer, there is at a minimum a fact issue as to whether this one bill placed her on inquiry notice and whether her payment of that bill was an unambiguous manifestation of her consent. And one of the issues that this court asked it to focus on is the record seems to be undisputed that she paid a hundred and some bills. She took the bill payment action every month regardless of whether there was a notice in her bill talking about online terms. And so the contracting process that Charter chose makes, at best, her payment of the bill ambiguous as to whether she ever saw this notice and knew what the consequences of paying that bill were. Counsel, I'm sorry to interject, but you said consequences of what Charter did. I thought it was Time Warner Cable at that stage. Yes, Your Honor. It was Time Warner Cable. And Charter has argued that they stand in the shoes of Time Warner Cable for all purposes. We disagree with that. But for purposes of whether a contract was ever formed before 2017, Time Warner Cable was the company giving the notice and Charter is the company relying on the notice. Okay, thank you. I would like to be sure to reserve several minutes for rebuttal. If the court has any other specific questions, I'm happy to answer them. I just have one specific question, Counsel, and I'm looking at 139. And thanks for getting me back to the right excerpt here. It says they've got a new subscriber agreement. It says there's an arbitration clause. It says very generally what an arbitration clause is. Limit the time that you have to bring a claim against us. And then it says review it. If you wish, opt out. So why isn't that sufficient to indicate that if you don't opt out, you're in? I believe we don't dispute the language that refers to arbitration and opt out. We dispute the fact that should she have known this bill in particular, would be changing her fundamental rights if she did not opt out. And that brings us back to the course of dealings between her and the company for the preceding four years. She had no indication that paying Bill Number 43 could completely change her rights and obligations with respect to the company. And one last point before I reserve my time. The conspicuousness, the clarity, the obviousness of the offer, and the particular manner in which a consumer can affirmatively consent to terms is entirely within Time Warner Cable or Charter's control. Time Warner Cable and Charter could have easily used a more conspicuous notice, could have easily attached terms, could have easily said, if you pay this bill, these are the terms you are agreeing to. It chose not to. It chose to take a passive approach at the contracting process and then argue that there can't be any material dispute of fact that she should have seen this notice in this one bill and she should have known exactly what that meant. By inputting a web address into a computer and reviewing those terms, Charter was controlling this process and we believe at a minimum there is a genuine issue of material fact as to whether the limited evidence Charter chose to place in the record and Ms. Hart's testimony that she didn't see it, she was not aware that this might happen to her and she did not know online terms existed until years later. We gave the genuine issue of material fact. Thank you. Judge Gould, let me say this. For your planning purposes, even though you've concluded your initial time and my extended 2 minutes plus 16 seconds, I'm still a softy and I'm going to give you an extra 2 minutes for rebuttal. But only 2 minutes for rebuttal after we hear from Charter's counsel. Thank you, Your Honor. That lets you plan. So now we'll proceed to argument for the appellees by Mr. Prince. And Blake, give Mr. Prince an extra 2 minutes here. No, beyond the 17th. So you've got 19 minutes, Mr. Prince, but you do not have to use every second of it if you don't need it. Understood, Your Honor. Thank you and may it please the court. Reasonable broadband subscribers understand that their use of internet services is governed by some terms of use. Ms. Hart has been a customer of ours since 2006, and over that period of time we have repeatedly provided her notice in a variety of ways that she is bound to our subscriber agreement. We've notified her when there's changes to her subscriber agreement, and she's affirmatively signed writings at least twice agreeing to be bound by our subscriber agreement. So if it pleases the court, I'll start with the question where Mr. Sotterstrom left off on formation of the 2014 agreement, and then I can move on to other questions if the court has it. With respect to the 2014 agreement, Judge Christian and Judge Stein, I think you were looking at the bill at ER 139. I would invite your attention to the one at ER 144, which is just the next month's bill, and it's even clearer. The relevant facts here are undisputed. It's undisputed that we sent this bill via U.S. Mail to Ms. Hart. She admitted below that she usually read her bills and she thought she had received them all. She admitted that she looked at her bills at least for the purpose of determining the amount of money she owed. I think the district court got it exactly correct here, which is the question is whether a reasonably prudent person would be on inquiry notice for looking at a bill like this, and the district court got it right. I think just like Judge Kotel in the Southern District of New York got it right in the Olson case we've cited, which is that billing statements in the context of a relationship with a cable company go to the heart of the customer relationship. This is the cable company's primary mechanism of communicating with customers. Not only do we communicate the price for the services owed, which can change over time, we communicate changes in channel lineup, we communicate important messages that the FCC requires us to communicate to customers, and yes, we communicate changes to contractual terms. Here in particular, we put, looking at the bill at ER 144, we put in all caps in the same size font as the material portions of the billing statement, you have a new subscriber agreement. We explained it has an arbitration clause. We prompted the user to do something. We said it's important. We said you should review it, and that you have a right to opt out of it. This is why I think district courts across the land have upheld this very sort of practice in the cable context. Mr. Soderstrom addressed the issue of consent, or assent, but in this context, once you're on conspicuous notice of new contract terms, and you continue to accept the benefits of the bargain, which is here, you continue to be our customer after we've told you there's a new service, under California law, that is a manifestation of assent. This has frequently come up in the context of at-will employment agreements, for example, where this court's opinion in Davis v. Nordstrom and the California courts have addressed this in an opinion called Craig v. Brown and Root, where an at-will employer will mail new employment terms to the employee, and because these people are in an existing voluntary relationship, your decision to continue to maintain employment is a manifestation of assent. I think the same holds true here. Even if there was any doubt about whether our billing statements provided adequate notice or Ms. Hart manifested her assent, I think that has to have been cleared up by August of this same year when she affirmatively signed a work order saying she was bound to our subscriber agreement. This is in the record at ER 173 to 176. Mr. Prince, her position there, if I remember correctly, is it was a work order and the workman just shoved it in front of her and said, sign, confirming that the work was done. More or less, that does ring true as to when the cable guy comes, what happens. What's your response to that? I'll quibble with the premise a little bit, Judge Stein. That is how Ms. Hart's counsel characterized the interaction in her brief. I don't think Ms. Hart's declaration says that. What Ms. Hart's declaration says is that a Time Warner Cable representative went to her house on multiple occasions, presented her with a device, and that she does not recall whether the agreement was above it or not, but she did sign it. That's what the declaration says. Even taking Mr. Soderstrom's, her counsel's characterization of what happened, that's irrelevant under California law. I would point the court to the Baker v. Italian Maple case, which we cited on page 27 of our brief. That case makes very clear that as a matter of California law, the fact you didn't read the agreement, the fact you don't remember signing it, and the fact that even that you didn't understand necessarily that you were signing a contract is irrelevant. In fact, the California courts have gone even farther, including in the desert outdoor advertising case, which we cited on page 28 of our brief, which is that even if our technician, contrary to the record evidence, but even if our technician had affirmatively represented to her that you don't need to read this thing, it's not important. As a matter of California law, it's deemed unreasonable to rely on representations like that because when you sign something, it has obvious significance and you're responsible for what you signed. Counsel, with all respect, you are overplaying your hand as far as I'm concerned here. I think the circumstances do absolutely go to where the notice was adequate. For me, just for my work, I'm only one of three, but for me it's much more helpful to look at the bill rather than something a technician put in front of her quickly under the circumstances that Judge Stein was just mentioning. So it's your time, but I just want you to know this particular argument strikes me as a weak one, and the other argument is the one that I'm going to be grappling with about the notice on the billing. Understood, Your Honor, and that, of course, is the primary argument we've made. The only last point I'll make about the signature pad or the signature on the work order is that even if it wasn't sufficient to form a binding contract, it seems sufficient to put her on actual notice that there was a contract, assuming she could have seen the text above it. So, like I said, our primary argument relies on the billing statements, and unless the Court has other questions about the billing statements, I can move on to a question I think that Judge Stein can respond to, which is the effect of a later opt-out on whether the agreement to arbitrate in 2014 still is valid. Before you get to that, counsel, let me ask a question about the billing statement because, to me at least, it's pretty clear and conspicuous and reasonable. And my sense is the law supports that. The cases support that. But if we're being realistic, isn't this really a legal fiction to a certain extent? It's like the shrink-wrap agreement that may or may not provide for arbitration or may or may not provide that there are trade secrets when you break the wrap. Or the privacy notices on websites. I doubt that very many people, except some judges, actually read the privacy notices, and even then they kind of give up after a minute or two. So isn't this notice on this bill very much like that, and would only survive because, as a legal fiction, it's just easier, rather than going into each case as to who really read it, what they understood, to say this is reasonable notice and to move on? I don't think so, Your Honor. Long before the world of Internet contracting, which is sort of a unique beast, the courts have long recognized that if you're on constructive notice of a contract's terms, you're bound to them. I mean, the Second Circuit in the Spex case, which is a case that has been cited against us, acknowledged that in the ordinary course, if you have a paper that puts people on notice of a contract, it's going to be enforced. The courts have adopted sort of specific rules in the context of the Internet era, including, as I think you were mentioning, the click wrap and the browser wrap. But here, I don't think any of that really matters, because Hart concedes that she usually read her bills, and she usually read the portion of her bill that's directly in front, directly on top of the notice that we gave about this particular contract. So I don't think... We're not sort of in the land of total speculation where there's a real question about whether any consumer would ever look at this. If there's no more questions on the billing statement, I'll just briefly address Mr. Soderstrom's argument about whether an opt-out from the 2017 agreement somehow superseded or extinguished the obligation to arbitrate from 2014. As we've argued in our brief, that argument is simply forfeited. It was not raised below even a shred of it. And I would respectfully invite the court's attention to the citations that Mr. Soderstrom made in the reply brief to say that he raised the argument, because none of them support that assertion. It's true that below he did say that there was an opt-out. He did assert that fact. But he made no legal argument about the effect of the opt-out. And the district court was not required to invent an argument on his behalf. Ms. Hart was not represented by pro-state counsel. She was represented by sophisticated counsel here. But even if the court were inclined to excuse the forfeiture, there's a more fundamental reason why it can't do that here. And that's because Ms. Hart failed to comply with the substantive requirements of federal law as articulated by the Supreme Court in Rent-A-Center and as applied by this court in Opus Bank. And the relevant issue here is that the 2014 subscriber agreement contains a delegation clause that delegates gateway issues of arbitrability to the arbitrator. Judge Carter below expressly found that. And Ms. Hart has not challenged that decision on appeal. And as this court explained in Opus Bank, when a contract has a delegation provision in it, inside of an arbitration clause, federal law treats it as three separate contracts that are all nested inside each other. There's the agreement as a whole. There's the arbitration agreement. And within it, there's a separate agreement to arbitrate gateway issues of arbitrability. If Ms. Hart wanted to argue that the arbitration clause in the 2014 agreement had been superseded by a later opt-out, she needs to launch an attack in the district court that was specific to the enforceability of the delegation clause. Opus Bank is absolutely clear that that's the requirement. She failed to do so. The district court held in the last paragraph its opinion that Ms. Hart raised no specific challenge to the enforceability of the delegation provision. And therefore, the district court was required to treat the arbitration clause as enforceable and all other issues were for the arbitrator to decide. In turn, Mr. Sonnerstrom and Ms. Hart did not raise any issues about the superseding effect of the later opt-out on the 2014 agreement before the arbitrator. And Ms. Hart has not launched any challenge to the arbitrator's reward. So the issue just is not before the court and cannot be decided by the court. I think Judge Gould, you asked a question about who could enforce the agreement, whether it's Time Warner Cable and the like. I believe the answer with respect to Time Warner Cable is fairly straightforward. And that is plaintiff's complaint admitted that Time Warner Cable merged into Spectrum Management Holding Company, which is a Delaware entity. And I really don't even think this is a question sort of of California law. I think it's a question of Delaware law. And the question is, today, who is Time Warner Cable? And I believe the answer to that is under Delaware law, Spectrum Management Holding Company. Time Warner Cable is subsumed within Time Warner Cable is subsumed within Spectrum Management Holding. We know that California courts would agree with that because the California Court of Appeal in the Jenks decision that we cited dealt with a very similar situation involving a merger of a law firm partnership with DLA Piper. And the court looked there to Maryland law and it said under Maryland law, the DLA Piper automatically assumed all the rights, obligations, property, and assets of the prior partnership and therefore could enforce the arbitration clause that was entered into with the prior partnership. The court also noted that California law would yield the same result, California corporations law, and of course Delaware law is the same. I think the law is generally uniform in the U.S. so that is the effect of a merger. With respect to the parent company charter, multiple California courts have recognized that parent companies in equity can enforce the arbitration clauses of subsidiaries. Otherwise, it would just be unmanageable because plaintiffs would be suing various entities in a corporate case. Does the court have any other questions about the third party enforcement question? We also put in additional evidence here that even under the plain terms of the 2014 agreement, the parent company would be able to enforce the contract as a third party beneficiary. So unless the court has any other questions for me, I'm happy to yield the remainder of my time. Okay, well, I have no questions. Judge Stein? I'm fine, thank you. No further questions from me, thank you. Okay. Okay, thank you, Your Honor.  Thank Mr. Prince for his argument. And we'll go back to Mr. Sutterson. Thank you, Your Honor. Briefly in rebuttal. First, this court held in Three Valleys v. E.F. Hutton that all reasonable doubts and inferences must be drawn in favor of the non-moving party. Here, the course of dealings for over multiple years, the inconspicuous, in our view, nature of the billing notices. And I have heard specific testimony saying she never saw these notices. She believes she reviewed her bills and did not understand that paying any of them formed a contract comprised of online terms. At a minimum, creates a fact dispute that cannot be resolved as a matter of law and must, under Section 4 of the FAA, be submitted to the jury. Second, there are multiple cases cited in our reply brief where the courts, in more clear circumstances than these, held that there was a genuine issue of material fact that needed to be submitted to a jury or an evidentiary hearing if a jury trial was not demanded. The Alvarez v. T-Mobile case, there was an electronically signed agreement that the company produced showing these terms were signed by the company. But based on testimony disputed over whether that agreement was communicated, whether the customer knew that signing a pad in the store meant agreeing to online terms that were not provided, was a fact issue that had to be resolved by a jury. The X-Hours v. Uber case, a clear, click-through, single-app page, that had to be decided under Section 4 through a trial. That was not an issue of law that the court could just decide without a trial. And finally, I believe that it's important that this is a consumer protection issue and the court cannot allow companies to make inconspicuous notices and then argue after the fact that the consumer should have known better and should have inspected advertising sections of bills in order to understand their rights and obligations related to their services. I'm sorry for going over 20 seconds, Your Honor. That's okay. We gladly grant the additional 20 seconds. Let me just say, at this point, we will conclude the argument unless Judge Stein and Judge Christen have a question for Appellate's counsel. I do not. I do not. Okay, therefore, the Hart v. Charter Communications case shall now be submitted. And just before we sign off for the day, let me just say, I want to again thank Counsel Mr. Silverstrom and Mr. Prins for your excellent arguments. The court, and this judge in particular, appreciates the advocacy of counsel who urged their clients' positions so well. And we can all review your arguments again online and go back and reread some of the cases, the cases you mentioned. But the court will issue its ruling in due course. So I thank you again. And with that, I'll just say, the Hart case is now submitted. We're adjourned for the day and for the week. Thank you, Your Honor. Thank you. Thank you. Thank you, Your Honor.
judges: Gould, Christen, Stein